AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means      ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of Express Line Corporation, 901 W. Arbor Vitae St, Inglewood, CA, 90301 | ) ) ) ) ) ) ) ) |

**NOTE: CHANGES MADE BY THE COURT**

Case No. 2:22-MJ-03131

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to <u>18 U.S.C. § 3103a(b)</u>, I find that immediate notification may have an adverse result listed in <u>18 U.S.C. § 2705</u> (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      8/10/2022 at 1:30 PM              _____
                                                               *Judge's signature*

City and state:      Los Angeles, CA                Honorable Steve Kim
                                                                *Printed name and title*

AUSA: Solomon Kim (x2450); Jay Weimer
(N.D. Tex. 817-252-5273)

AO 93C  (Rev  8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>EE101735347120 | Date and time warrant executed:<br>Aug 17, 2022  1000AM | Copy of warrant and inventory left with:<br>John Hsiao |
| Inventory made in the presence of :<br>John Hsiao | | |

Inventory of the property taken and name of any person(s) seized:

Refer to attached FD-597 form, U.S. Department of Justice Federal Bureau of Investigation Receipt for Property dated Aug 17, 2022.

---

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 8/18/2022

_____
*Executing officer's signature*

David J. Bolton
_____
*Printed name and title*

FD-597 (Rev. 4-13-2015)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
**Receipt for Property**

Case ID: 400T-DL-3523570, EE/01735347/20

On (date)  8/17/22

item (s) listed below were:
☑ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name) Express Line Corporation  John Hsiao
Vitac
(Street Address) 901 W. Arbor St.

(City) Inglewood, CA 90301

Description of Item (s):
- Item #2: Subpoenas from FBI & Commerce, & outreach material from 2020
- Item #3: Hsiang seal et, Gem Log shipping document
- Item #5: Wire Transfers from Gem Log to Express Log, November 2020
- Item #6: Exporter Registration for State Dept. License, rejection letter from Taiwan govt.
- Item #7: Shipping Documents from Express to Hsiang, 2019, 2018-2022
- Item #8: Wire transfers from Hsiang to Express Line, Nov 2018-Apr 2019
- Item #9: Wire transfers from Hsiang to Express Line Sept. 2018
- Item #17: Wire transfers from Gem Log to Express Line, December 2019
- Item #21: Commercial Invoices from Express Line to Gem Log, 2022
- Item #22: Dell Server Model E09S001, Service Tag: CD33GQ1
- Item #23: Dell Server Model E20S, Service Tag: DHNØDZ1
- Item #24: Dell Server Model E20S, Service Tag: DHPØD21
- Item #25: Dell Server Model E30S, Service tag: JDN9ØM2
- Item #26: WD Hard drive, Part# WDBYNNØØ2ØBBK-ØB, Serial: WXL2A67D5FN6
- Item #27: Dell Server Power Edge T130, Service Tag: B5GMCV2
- Item #20: Western Digital Network Storage Device Digital Model: My Cloud EX2
- Item #11: External USB Drive, Seagate, 5TB, Model: SRDØNF1, serial: NACS4JHG

Received By: _____ (Signature)
Printed Name/Title: John Hsiao

Received From: _____ (Signature)
Printed Name/Title: Jennifer Baker, SA FBI

FD-597 (Rev. 4-13-2015)

Page 2 of 2

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
#### Receipt for Property

Case ID: 400T-DL-3523570, EE/01735347)20

On (date) 8/17/22

item (s) listed below were:
- ☑ Collected/Seized
- ☐ Received From
- ☐ Returned To
- ☐ Released To

(Name) Express Line Corporation          John Hsiao

(Street Address) 901 W. Arbor Vitae St.

(City) Inglewood, CA 90301

Description of Item (s): -item #12: Desktop, HP Envy, Model TE01-0175xt, serial: 2M09375526
-item #1: Imaging from Black iphone in blue case, serial: DNPDVMDS0D83,
   IMEI: 358915480425732
-item #4: Imaging from Verbatim Flashdrive, 32GB
-item #10: Imaging from Desk Laptop, Dell Latitude E7450, service tag: 92RGN32
-item #13: Imaging from Laptop, LG Gram model 14Z980, serial: 805NAU01362H
-item #14: Imaging from Desktop, HP Envy Model 750-5655e, serial: 4CE7233C4W
-Item #15: Imaging from Desktop, HP Envy Model 750-537cb, serial: 4CE7354X2D
-item #16: Imaging from External USB Drive, Toshiba Model DTC 920, 1TB,
   serial: 59#16T0V7TRPG
-item #18: Imaging from laptop, Lenovo Thinkpad, X1 Carbon clamshell black,
   serial: R9-00K922
-item #19: Imaging from Dell Tower PC, D12M, Tower, Black serial: D09F7V1

Received By: _____ (Signature)

Printed Name/Title: John Hsiao

Received From: _____ (Signature)

Printed Name/Title: Jennifer Baker, SA FBI

**ATTACHMENT A**

**Property to be searched:**

LOCATION: EXPRESS LINE CORPORATION,
            901 W. Arbor Vitae St, Inglewood, CA 90301

DESCRIPTION:  Two story building at the 900 Block of W. Arbor
Vitae Street.



- **Two story office building and attached warehouse with
  lettering "Express Line Corporation" on the exterior doors.**





**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.  Evidence, fruits, and instrumentalities of violations of, and conspiracy to violate, United States export control laws by exporting and attempting to export goods or technology from the United States, either directly or through third countries, in violation of the Export Control Reform Act ("ECRA"), 50 U.S.C. § 4819, the Export Administration Regulations (EAR), 15 C.F.R. Parts 730-774, Title 18 U.S.C. § 371 (Conspiracy to Violate ECRA and the EAR), Title 13 U.S.C. § 305 (Submitting False or Misleading Export Information), and Title 18 U.S.C. § 554 (Smuggling Goods from the United States), and whether or not such transactions were actually completed, from September 4, 2018, to the Present, including:

a. All records, data, and/or communications reflecting or relating to the shipment or potential shipment of goods or technology, from the United States, directly or indirectly, to Seajet Company Limited, Hisiang Logistics Company Limited, Gemlog, or other associated entities.

b. All records, data, and/or communications reflecting or relating to the shipment or potential shipment of goods or technology, from the United States, directly or indirectly to Seajet Company Limited, Hisiang Logistics Company Limited, Gemlog.

c. All records, data, and/or communications reflecting or relating to the travel by persons associated with

or directed by Express Line Corporation to/from the United States, directly or indirectly related to Seajet Company Limited, Hisiang Logistics Company Limited, Gemlog.

      d. All records, data, and/or communications reflecting or relating to knowledge of United States export controls laws and regulations, including the designation of Seajet Company Limited and Hisiang Logistics Company Limited on the Entity List.

      e. All records, data, and/or communications reflecting or relating to compliance or non-compliance with United States export laws and regulations.

      f. All records, data, and/or communications identifying aiders, abettors, facilitators, coconspirators, or witnesses.

      g. All records, data, and/or communications reflecting or relating to Express Line Corporation and/or its officers, employees, contractors, accomplices, and/or facilitators, commission of or intent to commit violations of United States export laws and regulations.

      h. All records, data, and/or communications reflecting or relating to the location and travel of Express Line Corporation and/or its officers, employees, contractors, accomplices, and/or facilitators during the relevant time period.

      i. All records, data, and/or communications reflecting or relating to commodity classification of items

subject to U.S. export controls and the licensing of exports to destinations outside the United States.

    j. Such evidence, fruits, and instrumentalities that include – but are not limited to – the following (in any form):

       i. Contracts, agreements, quotations, purchase orders, invoices, *pro forma* invoices, packing lists, bills of lading, airway bills, Electronic Export Information ("EEI"), Shipper's Letters of Instruction, and other shipping and import/export documentation;

      ii. Facsimile communications, electronic mail ("email") communications, social media messaging, text messages, correspondence, telephone messages, calendars, sale acknowledgments, technical specifications, internal memoranda, notes from meetings and conversations concerning shipment or potential shipment of goods or technology, from the United States, directly or indirectly to China and other countries;

     iii. Letters of credit, bank drafts, bank statements, and other records of payment concerning any of these completed or contemplated transactions;

          iv.  Books of original entry, including but not limited to general, cash receipts, sales, cash disbursements, purchases, payroll and other journals concerning these completed or contemplated transaction;

          v.  Contracts, agreements, licenses, or technology control statements related to Seajet Company Limited, Hisiang Logistics Company Limited, Gemlog. or other pseudonyms used for Seajet Company Limited locations worldwide.

         vi.  General accounts, accounts receivable, accounts payable, and other ledgers of account concerning completed or contemplated export transactions;

     k. Any evidence of possession, ownership, custody or control of the target location and/or, any instrumentalities of the criminal offense.

     l. Company-issued electronic devices, including computers, tablets, electronic storage media, and cellular telephones issued to Express Line Corporation employees associated with the management of Express Line Corporation, shipping, compliance, sales, finance, travel, and product development.

     m. Any items designated to be shipped to Seajet Company Limited, Hisiang Logistics Company Limited, or Gemlog.

n. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

      ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v. evidence of the times the device was used;

      vi. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the

> > > > device, to run software contained on the
> > > > device, or to conduct a forensic examination
> > > > of the device;
> > >
> > > vii. records of or information about Internet
> > > Protocol addresses used by the device.

> > p. As used herein, the terms "records,"
> "information," "documents," "programs," "applications," and
> "materials" include records, information, documents, programs,
> applications, and materials created, modified, or stored in any
> form, including in digital form on any digital device and any
> forensic copies thereof.

> > q. As used herein, the term "digital device"
> includes any electronic system or device capable of storing or
> processing data in digital form, including central processing
> units; desktop, laptop, notebook, and tablet computers;
> personal digital assistants; wireless communication devices,
> such as telephone paging devices, beepers, mobile telephones,
> and smart phones; digital cameras; gaming consoles (including
> Sony PlayStations and Microsoft Xboxes); peripheral
> input/output devices, such as keyboards, printers, scanners,
> plotters, monitors, and drives intended for removable media;
> related communications devices, such as modems, routers,
> cables, and connections; storage media, such as hard disk
> drives, floppy disks, memory cards, optical disks, and magnetic
> tapes used to store digital data (excluding analog tapes such as
> VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

2.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ix

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.  If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

x

other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Express Line Corporation employees' thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such

a sensor), and direct which specific finger(s) and/or thumb(s)
shall be depressed; and (2) hold the device in front of the
employee's face with his or her eyes open to activate the
facial-, iris-, or retina-recognition feature, in order to gain
access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

     5.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## **AFFIDAVIT**

I, David J. Bolton, being first duly sworn, hereby depose and state as follows:

### I.    **INTRODUCTION**

1.    I am a Special Agent with the United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE") and have been since May 2020.  I am empowered by law to investigate and make arrests for offenses involving the unlawful export of goods and technology to destinations outside the United States.  Prior to becoming an OEE Special Agent, I was employed as a Special Agent for the Air Force Office of Special Investigations from September 10, 2012 – May 23, 2020.  My current responsibilities include investigating the illegal transfer and export of commodities, technology, and services from the United States, which are regulated by the United States Department of Commerce.  During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, including the investigation of export violations.

### II.   **PURPOSE OF AFFIDAVIT**

2.    This affidavit is made in support of a search warrant for the premises known as Express Line Corporation, 901 W. Arbor Vitae St, Inglewood, CA, 90301, hereinafter "SUBJECT PREMISES," further described in Attachment A, for the items to be seized

described in Attachment B.

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only, and all dates and times
are on or about those indicated.

### III.  **PREMISES TO BE SEARCHED**

4.    The premises to be searched is the SUBJECT PREMISES
described in Attachment A, which is incorporated herein by
reference.

### IV.  **ITEMS TO BE SEIZED**

5.    The items to be seized are the evidence, fruits, and
instrumentalities of violations of the Export Control Reform Act
("ECRA"), 50 U.S.C. § 4819, the Export Administration
Regulations (EAR), 15 C.F.R. Parts 730-774, Title 18 U.S.C. §
371 (Conspiracy to Violate ECRA and the EAR), Title 13 U.S.C. §
305 (Submitting False or Misleading Export Information), and
Title 18 U.S.C. § 554 (Smuggling Goods from the United States)
(the "Subject Offenses"), as described in Attachment B, which is

incorporated herein by reference.

## V.     SUMMARY OF PROBABLE CAUSE

6.    Evidence gathered during the investigation demonstrates that there is probable cause to believe that Express Line Corporation, and its owners and employees, were exporting goods to companies on the Entity List without obtaining necessary licenses in violation of United States export laws.  Interviews and investigation establish that there is probable cause to believe that records and evidence relating to such illegal exports are stored and maintained at the SUBJECT PREMISES.

## VI.    STATEMENT OF PROBABLE CAUSE

**Statutory and Regulatory Background**

7.    On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. § 4801 et seq.  In part, ECRA provides permanent statutory authority for the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774. In particular, the EAR restricts the export of goods and technology that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The

3

U.S. Department of Commerce is responsible for administering and enforcing the EAR.

8.   Section 4819(a)(2)(F), Title 50, United States Code, provides that "no person may make any false or misleading representation, statement, or certification, or falsify or conceal any material fact either directly to the Department of Commerce . . . or indirectly through any other person."

9.   Pursuant to 50 U.S.C. § 4819(a)(2)(A), "No person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by this subchapter, the Export Administration Regulations, or any order, license or authorization issued thereunder."

10.   Pursuant to 50 U.S.C. .C. § 4819(a)(2)(G), "No person may engage in any transaction or take any other action with intent to evade the provisions of this subchapter, the Export Administration Regulations, or any order, license, or authorization issued thereunder."

11.   Pursuant to 50 U.S.C. § 4819, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or other authorization issued under this part," and pursuant to § 4819(b), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in

the commission of, an unlawful act described in subsection (a) of this section" is subject to criminal penalties including a prison term of up to twenty years.

12. In addition to the above-described export violations, 13 U.S.C. § 305(a)(1) provides that:

> *Any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.*

Accordingly, it is illegal to provide false export information about items being exported from the United States, including information about the intended recipient of the item being exported; the location of the intended recipient; the value of the item being exported; and the description of the item being exported.

13. In February 1997, the BIS published the first Entity List as part of its efforts to inform the public of entities that have engaged in activities that could result in an increased risk of the diversion of exported, reexported and transferred (in-country) items to weapons of mass destruction (WMD) programs. Since its initial publication, grounds for

5

inclusion on the Entity List have expanded to activities sanctioned by the State Department and activities contrary to U.S. national security and/or foreign policy interests.

14.  The Entity List, which is found in Supplement No. 4 to Part 744 of the EAR, contains a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that are subject to specific license requirements for the export, reexport and/or transfer (in-country) of specified items. On an individual basis, the persons on the Entity List are subject to licensing requirements and policies supplemental to those found elsewhere in the EAR.

15.  The Entity List specifies the license requirements that it imposes on each listed person. Those license requirements are independent of, and in addition to, license requirements imposed elsewhere in the EAR. BIS evaluates license applications to any listed entity according to the policy stated in the "License Review Policy" column of the Entity List. If any applicable policy requires denial, BIS will deny the application, even if another policy provides for approval.

**Entities and Individuals Involved**

16.  Hisiang Logistics Company is an international transportation services and logistics company that caters to

6

foreign and domestic customers.  Its website states that it was
established in 1993, although according to Chinese corporate
records, Hisiang Logistics Company Limited was founded in 2004
with unified social credit code 91110105769389748T.  Its
registered scope of business includes non-vessel operating
common carriers (NVOCC), customs declaration, and freight
transportation. Hisiang Logistics Company Limited was previously
known in English as Seajet Company Limited; its most current
website still lists certificates issued to the company under its
Seajet moniker.  The company has two websites, one with the
domain name seajet.com.cn and a presumably newer one with the
domain name hisiang.com.

17.  Seajet's Managing Director was listed as Chinese
businessman George MA (a.k.a. Ma YUNONG) and Seajet's Director
of Business and Development was listed as David YAN according to
an announcement obtained during the investigation that was sent
to Express Line Corporation from Seajet Company Limited on March
27, 2018.

18.  According to Chinese corporate records, Hisiang
Logistics Company Limited is located at B-804 New Town, No. 88
Jianguo Road, Chaoyang District, Beijing.  This is corroborated
by the company's website.  According to Chinese corporate
records, its Shanghai branch office is located at Room 2201-23,

Building (1-5), No. 600 Hengfeng Road, Jing'an District,
Shanghai, the Wuhan branch office is located at Room 404 (8),
Zongbao Zone Building, No. 1998, Innovation Avenue, Dongxihu
District, Wuhan, and the Guangzhou branch office is located at
Zibian A25 3rd Floor, No. 98 Jianji Road, Haizhu District,
Guangzhou.

19.   Based on publicly available information, Hisiang
Logistics Company Limited has participated in petrochemical
industry expositions at which state-owned companies and
representatives from sanctioned countries such as North Korea
and Iran were present. The company has regularly participated in
the China International Petroleum and Petrochemical Technology
Equipment Exhibition (CIPPE) in multiple years along with state-
owned enterprises like China State Shipbuilding Corporation
(CSSC), China State Shipbuilding Industry Corporation (CSIC),
and Sinopec.  CSSC manufactures military surface and subsurface
vessels as well as civilian vessels.  CSIC, which had merged
with CSSC as of 2020, is a major contributor of Research &
Development (R&D), testing, and manufacturing of naval equipment
for the People's Liberation Army (PLA) Navy to include aircraft
carriers, nuclear and conventional submarines, surface warships,
and surface/subsurface weapons systems. Much of the R&D done at
CSSC's 28 research institutes is cross-applied as dual use,

8

military-civilian integration technology. Additionally, Hisiang
Logistics Company Limited was listed as an attendee at the 2018
Continental Bridge International Railway Transport Seminar and
the "One Belt One Road" International Multimodal Transport
Summit, which was also attended by representatives from North
Korea, Russia, and Iran.

20. In September 2018, Seajet Company Limited and Ma
Yunong, a/k/a, George MA, were added to the BIS Entity List for
violating the EAR and illegally procuring U.S. armored vehicles
for North Korea. In June 2021, Seajet's listing was revised to
reflect that Hisiang Logistics Company Limited and two other
named businesses are aliases for Seajet.

21. Express Line Corporation is headquartered at 901 W.
Arbor Vitae St., Inglewood, CA, and is part of the Freight
Transportation Arrangement Industry. There are six branches that
operate under the Express Line corporate family, to include
branches in Jamaica, NY and Grapevine, TX. Express Line
Corporation has 50 total employees across all locations and
generates approximately $35.09 million in sales (USD). Express
Line Corporation was established in 1985 and is a privately
owned company, owned by Richard SHIH. SHIH has maintained a
business relationship with Seajet's Managing Director George MA
since the 1990's.

22. Express Line Corporation employees relevant to this investigation that have worked within the premises/property to be searched include Richard SHIH, Charles YU, Weng JACINTO, Daphne NAKANO, and John HSIAO.

23. Richard SHIH is 74 years of age, a U.S. permanent resident, and has owned Express Line Corporation since its inception in 1985. SHIH continues to work at Express Line Corporation's headquarters in a part-time capacity.

24. Charles YU is 59 years of age, a U.S. permanent resident, and served as the Chief Executive Officer (CEO) for Express Line Corporation from approximately 2018-2020.

25. Weng JACINTO is 52 years of age, a U.S. permanent resident, and has worked at Express Line Corporation since 2000 and served as the accounting controller/manager from 2013-present.

26. Weng JACINTO was involved in establishing Express Line Corporation's Electronic Export Information (EEI) filing process. In a conversation with agents, JACINTO identified Gemlog as an alias for Hisiang Logistics Company Limited.

27. Daphne NAKANO is 38 years of age, a U.S. permanent resident, and has worked for Express Line Corporation since 2014 as an accounting manager. NAKANO provided information regarding Express Line Corporation's documentation and recordkeeping

10

practices.

28.   John HSIAO is 47 years of age, a U.S. permanent
resident, and has served as a station manager for Express Line
Corporation since 2011 and identified Gemlog as an alias for
Hisiang Logistics Company Limited.

**Facts Establishing Probable Cause**

29.   On September 4, 2018, Seajet Company Limited, located
in Beijing, China, was added to the BIS Entity List for their
involvement in the procurement of U.S.-origin armored vehicles
for the Democratic People's Republic of Korea (DPRK).   The
related BIS License Requirement and License Review Policy for
Seajet Company Limited indicated that a license was required for
all items subject to the EAR and there was a Presumption of
Denial for all BIS License Applications. This information was
published in Federal Register No. 83 FR 44824.

30.   Seajet Company Limited was nominated for Entity List
inclusion based on a United Nations report, and subsequent OEE
investigation, which revealed two armored Mercedes Benz S600
sedans were being used by the North Korean military after being
purchased from a Utah-based company.   The investigation revealed
that the vehicles were procured by Express Line Corporation on
behalf of the owner of Seajet Company Limited. The vehicles were
classified as EAR99 for export to China but would have required

11

a U.S. Department of Commerce license for re-export to the DPRK.
OEE Agents interviewed Jeff SHIH, the former manager of the
Express Line Corporation branch in Elk Grove, IL as part of the
investigation. During the interview, Jeff SHIH revealed that
Express Line Corporation was owned by his father, Richard SHIH,
and his stepmother Lynn SHIH.  Jeff SHIH also disclosed that
George MA, the owner of Seajet Company Limited, was a family
friend and Seajet Company Limited was one of Express Line
Corporation's oldest import/export agents in Beijing.

    31.  On or about May 14, 2020, I began investigating the
unlawful export of U.S.-origin commodities from Express Line
Corporation in Grapevine, TX, to Seajet Company Limited in
Beijing, China.  After Seajet Company Limited was added to the
BIS Entity List, OEE Special Agents conducted an Industry
Outreach with Express Line Corporation's New York branch on
December 4, 2018, and informed the branch manager that Seajet
Company Limited had been added to the Entity List.  Information
obtained during the Outreach revealed that the employees of
Express Line Corporation were unaware that Seajet Company
Limited was added to the BIS Entity List on September 4, 2018.
An Express Line Corporation employee verified that the last
shipment made to Seajet Company Limited was from Express Line
Corporation in Grapevine, Texas, on/about November 4, 2018,

possibly violating U.S. export laws and regulations by not obtaining an export license.  The Express Line Corporation EEI filer, Weng JACINTO in Inglewood, CA, revealed that the shipment was made to Hisiang Logistics Company Limited under Seajet Company Limited's account code.

32.  From August 31, 2020, to January 27, 2021, Express Line Corporation produced documentation in response to a BIS Administrative Subpoena. The documentation revealed that Express Line Corporation conducted approximately 283 shipments nationwide from September 6, 2018, to July 1, 2020, using Hisiang Logistics Company Limited as an intermediate consignee.[1] Express Line Corporation, however, failed to list Hisiang Logistics Company Limited as an intermediate consignee on all related EEI filings, in potential violation of U.S. export laws. The total declared value of the shipments was $12,430,518.23. A review of related e-mail correspondence provided with the

---

[1] In the EAR, an intermediate consignee is defined as the "person that acts as an agent for a principal party in interest and takes possession of the items for the purpose of effecting delivery of the items to the ultimate consignee.  The intermediate consignee may be a bank, forwarding agent, or other person who acts as an agent for a principal party in interest." 15 C.F.R. § 748.5(d). According to a BIS final rule published on August 20, 2020 (85 FR 51335), BIS clarified that supplemental license requirements for parties listed on the Entity List, pursuant to the Export Control Reform Act of 2018 (ECRA), apply to any listed entity when that entity is acting as a purchaser, intermediate or ultimate consignee, or end-user as defined in the Export Administration Regulations (EAR).

corresponding documents revealed that from December 2, 2018, to April 30, 2020, various e-mails were exchanged between Express Line Corporation employees and Seajet Company Limited Employees who were e-mailing from 'Seajet.com.cn' domain names and/or had Seajet Company Limited listed in their signature blocks but were conducting business on behalf of Hisiang Logistics Company Limited.

33. On September 29, 2020, BIS requested Express Line Corporation provide any correspondence related to Seajet Company Limited's name change to Hisiang Logistics Company Limited. In response to BIS's request, Express Line employee Weng JACINTO forwarded an announcement dated March 27, 2018, from Seajet Company Limited. The letter stated that due to an undisclosed business development, Seajet Company Limited would start a new trading name Hisiang Logistics Company Limited for international business while Seajet Company Limited would be reserved for domestic business. The announcement indicated that nothing else changed within Seajet Company Limited, including but not restricted to, the team, company structure and business ethics, etc. The announcement was signed by George MA, the Managing Director of Seajet Company Limited. The e-mail and announcement were forwarded to the following Express Line Corporation corporate personnel: Richard SHIH, President; Lynn SHIH, Vice

President; JACINTO, EEI Filer; and John HSIAO, Operations
Manager.

34.  On November 18, 2020, Special Agents from the OEE
Dallas Field Office (DAFO) interviewed Sarah WANG, the Manager
for Express Line Corporation's Grapevine, Texas branch. WANG
admitted to knowing that Express Line Corporation conducted
business with both Seajet Company Limited and Hisiang Logistics
Company Limited. WANG stated that all branch personnel received
Transportation and Safety Administration export training and
provided a copy of Express Line's internal "Shipper's List."
The list contained the names of companies that Express Line
Corporation would not ship to.  The list did not contain Seajet
Company Limited or Hisiang Logistics Company Limited.

35.  On May 18, 2022, Special Agents from the OEE DAFO and
the Defense Criminal Investigative Service (DCIS) interviewed
Richard SHIH, owner of Express Line Corporation.  R. SHIH stated
that he knew George MA in the 1990's before MA started Seajet
Company Limited.  MA worked as a secretary for Chinese shipping
company, EAS, which was owned and operated by China's Ministry
of State Security.  R. SHIH admitted that he knew Seajet Company
Limited and Hisiang Logistics Company Limited were the same
entity.  R. SHIH admitted that he knew MA and Seajet Company
Limited were "in trouble" with the Department of Commerce.  R.

15

SHIH stated that all decisions related to Seajet Company Limited and Hisiang Logistics Company Limited were made by R. SHIH due to his historical knowledge.  R. SHIH stated that Express Line Corporation should have all invoices, Shipper's Letter of Instruction (SLI), airway bills, etc., related to Seajet Company Limited and Hisiang Logistics Company Limited shipments available within their accounting department.

36.  R. SHIH stated he currently only spends 3-4 hours per day in the office mainly spends his time reading and replying to e-mails.  R. SHIH asked agents at the end of the interview if Express Line Corporation could continue conducting business with Hisiang Logistics Company Limited. The agents informed R. SHIH that he could not conduct business with any Entity Listed parties, to include Hisiang, and provided R. SHIH with a BIS Outreach package containing information on how to conduct checks on parties using the Consolidated Screening List (CSL).

37.  On May 18, 2022, Special Agents from the OEE DAFO and the DCIS interviewed Weng JACINTO, the accounting controller for Express Line Corporation. JACINTO indicated that Hisiang Logistics Company Limited had changed their Doing Business As (DBA) name to Gemlog and Express Line Corporation was continuing to conduct business with Hisiang Logistics Company Limited through their new DBA, Gemlog.  JACINTO believed the name change

occurred on/around November 2019. Express Line Corporation's last shipment to Gemlog occurred on May 14, 2022, and the last payment occurred on April 25, 2022. JACINTO believed the companies were the same based on the customer-base and the names of the employees.

38. JACINTO stated that the operations section would have commercial invoices and SLI's for shipments to Seajet Company Limited and Hisiang Logistics Company Limited and the accounting section likely maintained all related accounting documents from 2021-2022. All other historical documents would be in boxes located in Express Line Corporation's warehouse. Express Line Corporation did not use any "cloud storage" and all files were stored locally. JACINTO stated that Express Line Corporation did not check customers against the Entity List, except for some historical customers from the Middle East. JACINTO never checked to see if Seajet Company Limited or Hisiang Logistics Company Limited were on the Entity List. JACINTO heard that Seajet Company Limited was added to the Entity List by Express Line Corporation's operations section.

39. On May 18, 2022, Special Agents from the OEE DAFO and the DCIS interviewed Daphne NAKANO, an accounting manager for Express Line Corporation. NAKANO stated that all hard-copy invoices, statements, notices, SLI's, Airway Bills, were

17

maintained in cabinets located on the second floor of Express
Line Corporations headquarters in Inglewood, CA and within boxes
located in the attached warehouse.

    40.  On May 18, 2022, Special Agents from the OEE DAFO and
the DCIS interviewed John HSIAO, a station manager for Express
Line Corporation.  HSIAO indicated that Hisiang Logistics
Company Limited was now operating as Gemlog.  HSIAO stopped
sending shipments to Hisiang Logistics Company Limited after
OEE's inquiry into Hisiang's affiliation with Seajet Company
Limited.  HSIAO stated that Express Line Corporation started
doing business with Gemlog approximately 2-3 weeks after ceasing
business with Hisiang Logistics Company Limited.  Gemlog
serviced the same customers as Hisiang Logistics Company Limited
and had the same employees.  Express Line Corporation has been
doing business with Gemlog since then.  HSIAO was aware that
Seajet Company Limited and Hisiang Logistics Company Limited
were added to the Entity List.  HSIAO was aware that George MA
owned both Seajet Company Limited and Hisiang Logistics Company
Limited.  HSIAO noted that Hisiang was the Chinese
transliteration of Seajet.  HSIAO stated that Express Line
Corporation's U.S.-based customers had no knowledge that Express
Line Corporation routed shipments through Seajet Company
Limited, Hisiang Logistics Company Limited, or Gemlog.

18

41.  HSIAO admitted that Express Line Corporation employees do not receive export training and the employees do not check customers against the Department of Commerce Entity List.

42.  The OEE DAFO obtained six BIS license determinations for items shipped from November 28, 2018, to July 2, 2020, to Hisiang Logistics Company Limited from the Express Line Corporation branch located in Grapevine, Texas.  The license determinations indicated that licenses were required for all of the shipments since Hisiang Logistics Company Limited was an alias for Seajet Company Limited and the Entity Listing licensing requirements applied.  The OEE DAFO subsequently contacted the respective U.S. Principal Parties in Interest ("USPPI") associated with the shipments and determined that Express Line Corporation was responsible for routing the shipments through Hisiang Logistics Company Limited.

43.  On June 1, 2021, BIS published an Entity List revision for the existing Seajet Company Limited entry. BIS revised the entry to add three aliases, including Hisiang Logistics Company Limited; Beijing Haixiang International Transport Agency Co., Ltd.; and GDL Company Limited, along with five addresses. Hisiang Logistics Company Limited was added as an alias for Seajet Company Limited. The previous Licensing Requirement and License Review Policy remained unchanged.

44.  On June 11, 2021, BIS completed a certified License
History Check and determined that no license history was found
for Express Line Corporation from October 2012 to that date.

45.  It is my experience as a Special Agent that
individuals violating export control regulations, either working
on a profit basis and/or working on behalf of a foreign
government, will maintain records online and utilize numerous
Internet programs and computers.  It is also my experience that
violators of export regulations use the Internet and all
Internet instrumentalities, such as business websites, email,
and other Internet based programs to conduct their illicit
activities.  It is common practice for such violators to
maintain numerous files on their computers and to maintain
records in email and on Internet-based programs for long periods
of time.  Also based on my training and experience, I know that
individuals keep, retain, and maintain their paper records and
electronic records for a significant amount of time,
particularly when the records relate to business ventures.
Specifically, I know that individuals maintain records of
significant purchases and sales in order to maintain record of
the purchase or sale, including contact information and
financial information.  It is also my experience that violators
of the export regulations consistently violate the law over long

periods of time. Due to the complexity of international shipping and the difficulty in conducting international business, violators of the export regulations are meticulous in their efforts and spend a great deal of time and effort to effect their illegal transactions. Further, U.S. export controls laws and regulations require participants in export transactions to retain records, including electronic records, related to their exports for a period of 5 years. (See 15 C.F.R. Part 762).

46. Based on the investigation, your affiant believes that Express Line Corporation conducted approximately 283 shipments nationwide from September 6, 2018, to July 1, 2020, to Seajet Company Limited and Hisiang Logistics Company Limited, an Entity Listed party, as an Intermediate Consignee in violation of U.S. export laws. I believe they did this by using Seajet Company Limited and their DBA, Hisiang Logistics Company Limited, interchangeably throughout their scheme and omitting any reference to either party on any export records, all the while knowing that they were the same company with the same company officers, business addresses, and team members.

47. At all times relevant to this investigation, the EAR was in effect and permission, in the form of an export license issued by the U.S. Government, was required to legally export

any item under the jurisdiction of the EAR to the Entity Listed party in China.  At no time did Express Line Corporation, apply for, receive, or possess a license or authorization from BIS to export the items to the Entity Listed party in China.

48.  In my review of various documents, records checks, email communications, and interviews, your affiant believes that Express Line Corporation has stored digital communications, shipping records, export documentation, and other related accounting documents on local electronic storage mediums and in hard-copy form located at the SUBJECT PREMISES that directly related to their business dealing with Seajet Company Limited, Hisiang Logistics Company Limited, and Gemlog.  I believe evidence of the unlawful exports are contained within the electronic storage mediums on the premises. In addition to the electronic storage mediums and based off my training and experience, it is my belief that evidence of the unlawful exports of are also stored on Express Line Corporation cellular devices.  Based on my training and experience, it is common for both lawful and unlawful international export communications to be conducted on cellular devices using third-party communication applications to discuss logistical and financial information. Lastly, based on my training and experience, it is common practice for businesses to store and maintain physical records

of business dealings and it is my belief that there are physical records of the unlawful exports located at the SUBJECT PREMISES.

## VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

49.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    50.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

        a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

        b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    2.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

        a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

   c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Express Line Corporation employees' thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Express Line Corporation employees' face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

   d. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

26

## VIII.    <u>CONCLUSION</u>

51.   For all the reasons described above, there is probable cause to believe that Express Line Corporation, its owners, and its employees violated the "Subject Offenses".

52.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2022.

_____
UNITED STATES MAGISTRATE JUDGE